IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARVELLE BROWN,

                      Plaintiff,

          v.

ROBERT A. McDONALD,[1]
Secretary, Department of Veterans Affairs,

                   Defendant.

OPINION AND ORDER

13-cv-705-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this case brought under Title VII of the Civil Rights Act, plaintiff Marvelle Brown alleges that he was suspended and then fired from the Department of Veterans Affairs because he complained about discrimination.   In his motion for summary judgment, dkt. #13, defendant Robert McDonald says that plaintiff was suspended and fired for various disciplinary infractions, including repeatedly failing to secure the warehouse where he worked.  Having reviewed the parties' summary judgment materials, I conclude that no reasonable jury could find that defendant retaliated against plaintiff for engaging in conduct protected by Title VII.   Accordingly, I am granting defendant's motion for summary judgment.

From the parties' proposed findings of fact and the record, I find that the following

---

[1] Robert McDonald has been substituted for Erik Shinseki in accordance with Fed. R. Civ. P. 25.

facts are undisputed.  (Defendant objected to many of plaintiff's proposed findings of fact because plaintiff relied on his own prelitigation statements such as emails and letters to prove the truth of particular facts.  Defendant objected on hearsay grounds, but that objection could apply to *any* statement in the record on summary judgment, including affidavits, because all written statements are made "out of court."  Defendant's true objection seems to be that plaintiff was relying on *unsworn* statements to prove the truth of a matter.  However, "it's an open question in this circuit whether anything more than an unsworn statement is needed to oppose summary judgment."  Olson v. Morgan, 750 F.3d 708, 714 (7th Cir. 2014).  Because it is not clear whether statements must be sworn to be admissible at summary judgment and because considering the unsworn statements does not change the outcome of defendant's motion, I did not reject any of plaintiff's proposed findings of fact on the ground that they relied on an unsworn statement.)

## UNDISPUTED FACTS

Plaintiff Marvelle Brown served in the United States Marine Corps from 1991 to 2004.  He is an African American.  In 2005, he began working for the Department of Veterans Affairs as a teller, processing and depositing insurance checks.

In 2009, he became the inventory management specialist at the consolidated patient account center in Middleton, Wisconsin.  Among other things, the inventory management specialist is responsible for ordering and maintaining supplies to support the operations; shipping and receiving deliveries; maintaining keys to vehicles, offices and cubicles; and

securely storing veterans' records. Plaintiff worked in the center's logistics warehouse, where equipment, supplies and records are stored, and his responsibilities included securing the warehouse.  Plaintiff was the only employee assigned to the warehouse.  In February 2012, John Shealey, the chief financial officer of the center, became plaintiff's supervisor.

The center is a secure facility because the work there includes the processing of medical claims, which include information such as confidential health information, social security numbers and bank account information.  In addition, the center handles cash and checks.  Accordingly, access to the center is restricted to employees or individuals accompanied by an employee.  Visitors are required to use the front entrance to enter and exit the building and to sign a visitor's log.

Employees at the center, including plaintiff, receive security training.  Among the examples of security violations included in the training is an unauthorized person using a department computer.  The rules accompanying the training prohibit employees from allowing someone else to use a department computer while the employee is logged on to it.

On May 16, 2012, Ernest Washington, a program analyst for the department, was conducting an annual safety evaluation of the Middleton center, accompanied by Marilyn Schwab, an administrative officer responsible for conducting safety inspections.  When they went to the supply warehouse, they discovered plaintiff with another individual who was not an employee.  (The parties dispute whether plaintiff informed Shealey earlier that day that Kelly Martinson, the mother of plaintiff's son, was going to bring him lunch so that they could discuss a doctor's appointment.  According to plaintiff, Shealey told plaintiff that he

(Shealy) did not have a problem with that.)  After some discussion, Martinson left.  (The parties dispute the details of the discussion and whether Martinson was using plaintiff's computer.)  Martinson did not sign the visitor's log when she entered the building and she exited through the back door rather than the front.  Shealey did not give plaintiff permission to ignore those requirements.

Later that day, plaintiff sent an email to Shealey and Loretta Gulley (the Middleton center's director) in which he wrote, "I feel that I am working in a hostile work environment and discriminatory and unfair conditions."  (Plaintiff did not explain what he meant by "discriminatory.")  In addition, he wrote that he believed that Schwab had been "rude and disrespectful," had embarrassed plaintiff and Martinson and had treated Martinson "like a terrorist."  In response, Shealey told plaintiff that he (Shealey) would have handled the situation differently from Schwab.  In addition, Shealey said that "he would take care of it" and that it was "not a big deal."  Plt.'s Dep., dkt. #12, at 145.  Shealey did not tell plaintiff that he was going to be disciplined for the incident.

In an undated report, Washington made the following observations about the incident:

• Schwab used her access card to enter the warehouse after unsuccessfully attempting to get the person inside to respond;

• Plaintiff was seated in his office with his feet propped up;

• A young woman was sitting at plaintiff's desk on the computer;

• Schwab told plaintiff that no one was allowed in the secure area unless there on official business and that the woman would have to leave;

4

• Plaintiff acknowledged that but took no action and did not ask the woman to leave;

• Schwab then said it a second time and the woman left;

• When the woman left, plaintiff said to Schwab something to the effect of, "Oh, you've pissed her off now."

Washington forwarded a copy of his report to Shealey.

On June 14, 2012, Shealey submitted a request to the workforce management office to take disciplinary action against plaintiff. Shealey provided the office a copy of Washington's report.

On June 15, 2012, Schwab emailed a report to Gulley regarding the May 16 incident. The report included the following observations:

• On May 16, 2012, Schwab and Washington went to the warehouse for a safety inspection and found plaintiff and an unidentified woman in the warehouse office;

• The woman in plaintiff's office was sitting in front of plaintiff's computer;

• Schwab asked plaintiff to have his visitor leave the warehouse area, to which plaintiff responded his visitor would leave when they were finished;

• Schwab stressed to plaintiff that unauthorized individuals were not allowed in the warehouse and that the individual needed to leave;

• Schwab asked plaintiff's visitor to leave and the visitor did so by exiting through the rear door of the warehouse leading into the employee parking lot.

On June 26, 2012, in response to a request from the workforce management office, Shealey asked Washington to clarify whether the individual with plaintiff on May 16 was using a government computer. Washington said that she was typing on the keyboard and using the mouse.

5

On June 27, 2012, plaintiff contacted the Equal Employment Opportunity Counselor to report a claim that he had been subjected to discrimination because of his race, sex and disability.  (The parties do not provide any other details about that contact.)

Also on June 27, Shealey informed plaintiff that his mini-refrigerator was not permitted under department policy and asked plaintiff to remove the refrigerator.  In response, plaintiff wrote that no one had complained about the refrigerator before, although it had been there for a year.  He asked Shealey for a copy of the policy, but Shealey never provided one.

In a letter dated June 28, 2012, the EEO counselor sent plaintiff a letter, summarizing the type of discrimination plaintiff alleged (harassment because of race, sex and disability), informing him of his rights and asking whether plaintiff wanted to remain anonymous and whether plaintiff wanted a representative.  Plaintiff signed the letter on June 30, 2012, indicating that he did not want to remain anonymous and that he did want a representative. Shealey believes that he saw the letter "at some point after" the date plaintiff signed it. Shealey Dep., dkt. #28, at 48.

On June 29, 2012, Shealey asked to see the computer logs for May 16, 2012, so that he could determine whether "veteran information was accessed during that time." On July 13, 2012, Shealey asked to see the computer logs from May 16, 2012, to the present.

On July 30, 2012, Shealey told plaintiff to remove the refrigerator by the end of the day.  In response, plaintiff told Shealey that he did not have a vehicle to transport the refrigerator but that he would unplug the refrigerator that day and then move it in about a

month when his truck was repaired.  In addition, plaintiff wrote, "If that's not acceptable, let me know."

On August 2, 2012, plaintiff was in the warehouse discussing "a union matter" with another employee, Linda Shirley.  The same day, Schwab was escorting a vendor technician to the warehouse.  Schwab signed the visitor's log; the technician did not.  When Schwab discovered plaintiff with the other employee, she told the employee that she needed to leave and make an appointment.

Schwab sent an email to Shealey and Gulley about the incident, stating that she had discovered plaintiff in the warehouse office "with an unidentified female" who did not have an employee badge.  After observing that the woman had not signed the visitor's log, Schwab asked the woman to leave.  When Schwab attempted to walk into the warehouse office to show the technician the key cabinets,  Schwab wrote that plaintiff "postured himself in such a manner directly in front of [Schwab], he blocked [her] access further in the warehouse office area."  Schwab said that she felt "intimidated and threatened" by plaintiff.

Also on August 2, 2012, Shealey told plaintiff in an email that Shealey had observed that the main door to the warehouse was propped open and he reminded plaintiff that the door should be secured at all times.  In response, plaintiff asked what he should do when he has to take something to the dumpster or a delivery is outside.  Shealey did not respond.

On August 7, 2012, Shealey issued plaintiff a proposed seven-day suspension for the following reasons:

Charge: Violation of Security Policy

Specification a: On May 16, 2012, you let an unauthorized user access and use your work computer. This is a violation of the Veterans Affairs (VA) National Rules of Behavior regarding information security.

Charge: Inappropriate Conduct:

Specification a: On May 16, 2012, during a building safety inspection, you made an inappropriate remark to Marilyn Schwab, Administrative Officer, when you stated words to the effect "Oh you have pissed her off now!"

Specification b: On May 16, 2012, during a building safety inspection, you made an inappropriate remark to Marilyn Schwab, Administrative Officer, when she asked you to have the visitor leave the area, you stated words to the effect "she will leave when she is finished."

Specification c: On August 2, 2012, at approximately 2:40 PM, you stepped in front of Marilyn Schwab, Administrative Officer, and blocked her access as she was walking to the key storage cabinets.

Charge: Failure to Follow Supervisory Instructions:

Specification a: On June 27, 2012, you were advised to remove the refrigerator from your work area. You failed to remove the refrigerator as directed and the refrigerator was still in your work area on July 12, 2012.

Specification b: On July 12, 2012, you were directed to remove the refrigerator from your work area with a deadline of close of business, July 13, 2012. You failed to remove the refrigerator as directed and the refrigerator was still in your work area on July 30, 2012.

Charge: Failure to follow Instructions:

Specification a: On May 16, 2012, you allowed a visitor into the CPAC facility without having requested prior permission as required by policy P732-024, Building Security and Access.

Specification b: On May 16, 2012, you allowed an [sic] visitor into the CPAC facility without following required check in procedures as required by policy P732-024, Building Security and Access.

Specification c: On May 16, 2012, you allowed a visitor to leave the facility via the rear door of the warehouse instead of exiting through the main

entrance and did not have the visitor check out, as required by policy P732-024, Building Security and Access.

Specification d: On May 16, 2012, you allowed an unauthorized visitor into the secured Inventory/Logistics area. This area is restricted to only those individuals requiring access to carry out their day-to-day duties and have been cleared for access to those specific areas.

Specification e: On or about May 24, 2012, you failed to secure keys in your office in the Logistics area and left them on your desk unsecured.

Specification f: On or about 24 May 2012, you failed to secure access codes/cards in your office in the Logistics area and left them unsecured in a box under your desk.

Specification g: On August 2, 2012, at approximately 2:40 PM, you allowed an unauthorized employee into the secured Inventory/Logistics area to talk about union business, which was not appropriate.

Charge: Improper Conduct:

Specification a: On July 13, 2012, you utilized the internet for personal reasons during your work hours from approximately 8:14 am until 8:55 am.

Specification b: On July 16, 2012, you utilized the internet for personal reasons during your work hours from approximately 9:45 am until 10:42 am.

As part of the disciplinary process, plaintiff was allowed 14 days to respond to the charges. In a response dated August 24, 2012, plaintiff addressed some of the allegations against him. He denied that Martinson had used his computer. He did not deny making the comments attributed to him in the proposed suspension, but he said he made the comments because he was "upset with the manner in which Ms. Schwab was addressing me and the individual who was visiting." With respect to the allegation that plaintiff blocked Schwab's path on August 2, plaintiff said that the allegation "does not accurately reflect the dynamics of what had occurred," but he did not give his own version of the incident. With respect to

9

the allegation that plaintiff refused to remove his refrigerator, plaintiff said that "[r]efrigerators are prevalent throughout the [center]" and that he had not been given an explanation for removal.  (Plaintiff did not identify any other employees with refrigerators and he has not cited any evidence in his summary judgment materials that Shealey allowed other employees to keep a refrigerator.)

With respect to the allegation that plaintiff allowed a visitor to enter the facility without receiving prior permission, plaintiff said that he interpreted the department policies as allowing employees to "exercis[e] [their] judgment on who is given access."  With respect to allegations that plaintiff did not follow check in procedures for visitors, allowed a visitor to use the rear entrance, allowed a visitor into a restricted area and failed to secure access cards in his office, plaintiff said that the charge "would most likely not have been included had opportunity for responding to this allegation been given," but he did not explain why he believed that.

With respect to the allegation that plaintiff gave an unauthorized employee access to the warehouse to talk about union matters on August 2, plaintiff said that it was "subjective" whether his conversation was inappropriate.  With respect to the allegation that plaintiff had been using the internet for personal reasons, plaintiff said that it was "disturbing" because it suggested that his "activities are under scrutiny."  In addition, he said that "it is highly probable that occasionally all employees at the [center]" have used the internet for personal reasons.

Plaintiff submitted a separate response in which he stated that he had not been

10

questioned about any of the allegations before he received the charges.

Plaintiff admits the following things related to the proposed suspension: on May 16, 2012, he let Martinson come in through the back door without signing the visitor's log; on May 16, 2012, he told Schwab that Martinson would leave when they are finished and that Schwab "pissed off" Martinson; he left keys and access cards unsecured in his office; and he used his office computer for personal use.

Also on August 24, Schwab filed her own administrative complaint in which she alleged that she had been subjected to a hostile work environment because of her age and sex.

On September 5, 2012, around 8:00 a.m., plaintiff informed Shealey in an email that he "was attempting to go to Menard's this morning to get the garbage cans for our picnic," but he did not have any keys to the center's van. Around 10:00 a.m., Shealey and Shane Holden, the internal controls manager, went to the warehouse to look for garbage cans. They observed that the service door to the warehouse was propped open by approximately one inch. Shealey swiped his badge when he entered the warehouse, but Holden did not. The center's policy on "Building Security and Access" states that "[e]ach employee will independently scan their proximity card for access at the facility. 'Piggy-backing' (following another employee into the building while the door is open) is discouraged." Holden waited for plaintiff for 15 to 20 minutes, but plaintiff did not return. When Holden left, he saw plaintiff outside the warehouse.

Holden prepared a report for Shealey in which he alleged that he had observed that

11

the service door to the warehouse was propped open.  At the time, Holden did not have any knowledge of plaintiff's discrimination complaints.  In response, Shealey contacted the department's information security officer and reported a potential security breach.   In addition, Shealey requested an audit by an employee from another center to determine whether anything had been taken from the warehouse.  The department was required to pay for the other employee's travel expenses and overtime.

On September 6, 2012, Shealey decided to withdraw the proposed seven-day suspension and amend it to add the September 5 incident.  An employee in the human resources department stated that his "advice is not to pull back the suspension as it would not increase the penalty and I think you should get this first step on the books.  He could keep doing things and you could pull back the suspension many times."

On September 7, 2012, Shealey issued plaintiff a proposed 14-day suspension.  The reasons were the same as the proposed seven-day suspension, except that Shealey added the alleged September 5 incident:

Charge: Violation of Security Policy

Specification b: On September 5, 2012, you left the warehouse premises with one door unlocked and one door propped open. Veteran Personally Identifiable Information was left unsecured. This is a violation of the Veterans Affairs (VA) National Rules of Behavior regarding information security.

Charge: Failure to Follow Instructions:

Specification h: On September 5, 2012, you left your work area unsecured. Your work area contains approximately $65,000 of government assets. You failed to lock one door and left another door propped open. You placed significant government assets at risk and violated policy, P732-022, Clean Desk Policy.

12

On September 26, 2012, plaintiff provided a written response, in which he addressed the new charges and provided new information regarding some of the earlier charges.  With respect to the visit from Martinson, plaintiff stated that Shealey had approved the visit. With respect to the failure to remove the refrigerator, plaintiff said that no one had explained to him why the refrigerator needed to be removed and  he wondered why because he had had the refrigerator for a long time without any concerns expressed.  In addition, plaintiff said that he moved the refrigerator as soon as he got "appropriate transportation."

With respect to the August 2 incident, plaintiff said that he had discussed union issues with other employees on a number of occasions in front of supervisors, but no one had suggested he was doing anything wrong. (In his summary judgment materials, plaintiff does not deny that he was not permitted to discuss union issues while he was working in the warehouse and he does not cite any instances in which Shealey had allowed him to do that in the past.)  With respect to blocking Schwab's access on August 2, plaintiff said that Schwab was walking in the door as he was trying to exit and that they "managed to get around each other without saying a word."  With respect to the failure to secure keys and access cards, plaintiff said that the items at issue "were no longer of use of our facility." (Plaintiff did not explain what he meant by that.)  With respect to the allegation regarding internet usage, plaintiff said that he is allowed to use the internet for personal use during breaks and lunch, for up to one hour each day and that, "[a]ccording to the charges, I have spent a total of 2 hours of personal internet use in five months."

With respect to the September 5 incident, plaintiff said that "[d]oors being unlocked

within the building is a common practice" at the center, that the service door "was not propped open to my knowledge" and that Shealey knew that plaintiff would not be at the warehouse on the morning of September 5 because he had asked plaintiff to pick up garbage cans then.  Plaintiff wrote, "It seems very convenient and coincidental that the alleged violations [occurred] during a period of time it was known that I was to be absent."

On October 2, 2012, plaintiff filed an additional response.  In that response, plaintiff did not address the substance of the allegations against him, but instead criticized the procedures the department used.  In particular, plaintiff said that Shealey had not addressed his August 24 responses and that the proposed suspension violated the department's progressive discipline policy.

On October 3, 2012, after reviewing plaintiff's responses, Shealey decided to sustain the proposed suspension.  Shealey's decision included the following language:

> The number of sustained offenses against you is unacceptable.  The seriousness of these offenses cannot be ignored.  You have shown a blatant disregard for the policy and procedures at the North Central Consolidated Patient Account Center (NC CPAC).  You have displayed an attitude of disrespect and animosity toward management officials at the NC CPAC that is unacceptable.  You violated the most basic, but crucial, responsibility of your position when left the warehouse door, not only unlocked, but standing open, during your absence.  This security breach not only placed approximately $50,000 worth of NC CPAC assets at risk, it left Veteran's Personally Identifiable Information (PII) unprotected.
>
> Your actions have depleted my confidence in your ability to satisfactorily perform the duties of your position.  You have provided no information that would warrant mitigation of penalty for my consideration.

On October 11, 2012, plaintiff filed a "Complaint of Employment Discrimination" with the department.  Under the heading "Basis," plaintiff wrote "Disability," "Race" and

14

"Sex."  Under "Claims," plaintiff wrote "Harassment/Hostile Work Environment" and "14 Day Suspension."  The following day, a copy of the complaint was sent to Gulley, who forwarded the complaint to Shealey on October 15.  (In his deposition, Shealey testified that he did not remember when he first saw the complaint.  In response to counsel's question whether it "could have been October 12th, it could have been October 15th, it could have been subsequent to those dates," Shealey answered, "That's correct."  Dkt. #28 at 87-88.)

Plaintiff's last day before the suspension was October 12, 2012, a Friday.  Shealey entered the warehouse at 3:45 p.m.  At 4:04 p.m., plaintiff emailed Shealey regarding the tasks that would need to be performed in his absence. When plaintiff left the warehouse between 4:00 p.m. and 4:30 p.m., no one else was there.  According to defendant's records, no one entered the warehouse until October 15.

Brad Boutelle was plaintiff's substitute during the suspension. On October 15, 2012, when Boutelle arrived at the warehouse around 7:00 a.m., he observed that one of the overhead bay doors was unlocked. Boutelle prepared a report for Shealey.  At the time, Boutelle did not know that plaintiff had filed a discrimination complaint.  After reviewing the report, Shealey concluded that plaintiff should be terminated.  Shealey did not interview Boutelle or conduct any other investigation.

When plaintiff returned from his suspension on October 29, 2012, he received a removal notice that included the following language:

Charge: Failure to Follow Instructions

Specification: On Friday, October 12, 2012, you failed to secure your work area when you left the facility. The large warehouse door was left unlocked for

15

two days. Government assets and Veteran Personally Identifiable Information were left unsecured and at risk. Your actions constitute Failure to Follow Instructions.

In addition,  Shealey wrote, "You were issued a fourteen (14) day suspension on October 3, 2012, in part for a similar violation. This is evidence of the clarity with which you were made aware of the seriousness of this offense, as well as your minimal potential for rehabilitation."

After he received the proposed removal, plaintiff stopped working for defendant.  In a response dated November 20, 2012, plaintiff wrote that the charge was "false," that "the door had been secured" when he left work on October 12 and that "there has not been any recorded indication of any fact-finding that might remotely substantiate this claim."

On November 28, 2012, Gulley sustained the decision to remove plaintiff.  On November 30, plaintiff was terminated.

Boutelle became the inventory management specialist after plaintiff was terminated.


OPINION

Plaintiff brings his claim under 42 U.S.C. § 2000e-3(a), which prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  Originally, plaintiff included claims that defendant had discriminated against him because of his race and sex and because he suffers from post-traumatic stress disorder,

16

dkt. #1, but plaintiff later voluntarily dismissed those claims, dkt. #11, leaving only his retaliation claim.

The parties agree that plaintiff engaged in two acts protected under § 2000e-3(a): (1) contacting  an EEO counselor on June 27, 2012; and (2) filing a charge on October 12, 2012.   Plaintiff also mentions a May 16, 2012 email in which he wrote, "I feel that I am working in a hostile work environment and discriminatory and unfair conditions," but he does not argue that the email qualifies as protected conduct under § 2000e-3(a), presumably because the email did not identify a particular form of discrimination that is prohibited by Title VII.  Tomanovich v. City of Indianapolis, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.").  Accordingly, I have not considered the May 16 email as part of plaintiff's claim.  In addition, for the purpose of defendant's motion for summary judgment, the parties agree that plaintiff's suspensions and termination are sufficiently adverse to support a claim under § 2000-3(a).  Arizanovska v. Wal-Mart Stores, Inc., 682 F.3d 698, 704 (7th Cir. 2012) ("[F]or an employment action to be adverse, the challenged action must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.") (internal quotations omitted).

The only issue in dispute is whether a reasonable jury could find that defendant suspended or terminated plaintiff because he contacted the EEO counselor or because he filed an administrative complaint.  Hobgood v. Illinois Gaming Board, 722 F.3d 1030,

17

1038-39 (7th Cir. 2013) ("The ultimate question the parties and the court always must answer is whether it is more likely than not that the plaintiff was subjected to the adverse employment action because of his protected status or activity.").   Although the Court of Appeals for the Seventh Circuit has discussed different methods for proving discrimination and retaliation, the court has emphasized in a number of recent cases that plaintiffs are free to prove their claims with any combination of admissible evidence that supports the drawing of an inference that the relevant decision makers acted with an unlawful motive.   Bass v. Joliet Public School Distruct No. 86, 746 F.3d 835, 840 (7th Cir. 2014) ("Under current law Bass may prove her claim through either the 'direct' or 'indirect' method of proof, although we have observed that when all is said and done, the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination."); Hitchcock v. Angel Corps, Inc., 718 F.3d 733, 737 (7th Cir. 2013)("[W]e hasten to join in the growing chorus of opinions in this circuit, signed onto by a majority of active judges, that have expressed frustration with the confusing 'snarls and knots' of this ossified direct/indirect paradigm, and that have suggested a more straight-forward analysis of whether a reasonable jury could infer prohibited discrimination.").   Accordingly, I will consider all of the evidence plaintiff has presented, "even if the proof does not fit into a set of pigeonholes." Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996) (per curiam).

A.   Statement by Shealey

18

First, plaintiff points to Shealey's October 3, 2012 statement that plaintiff "displayed an attitude of disrespect and animosity toward management officials at the NC CPAC that is unacceptable."  Plaintiff says that the statement is evidence that Shealey was angry at him for speaking to the EEO counselor, but he does not explain why it would be reasonable to interpret the statement that way.  Shealey did not refer to plaintiff's complaint or suggest that he believed that complaining about discrimination is a sign of "disrespect and animosity toward management officials."  Further, the statement is included in a paragraph in which Shealey is summarizing plaintiff's disciplinary infractions, so the context of the statement suggests strongly that Shealey was referring to plaintiff's contentious interactions with Schwab and his failure to follow Shealey's instructions, which were both reasons listed for plaintiff's suspension.  Ambiguous comments may be evidence of an unlawful intent if the comment was tied to the plaintiff's protected conduct or if there is no other explanation for the comment, e.g., Egan v. Freedom Bank,  659 F.3d 639, 643 (7th Cir. 2011), but, in this case, plaintiff's interpretation of Shealey's statement is supported by nothing but speculation.  Cf. O'Neal v. City of Chicago, 588 F.3d 406, 410 (7th Cir. 2009) (supervisor's statement that plaintiff was "a complainer" not probative without evidence tying statement to protected conduct).

## B.  Treatment of Other Employees

A second way that a plaintiff may prove unlawful intent is with evidence that he was treated less favorably than a similarly situated employee who did not complain.  Cung Hnin

v. TOA (USA), LLC, 751 F.3d 499, 504-05 (7th Cir. 2014).  Plaintiff says that Schwab is similarly situated because she was not disciplined for failing to sign in Ernest Washington when he and Schwab conducted a safety inspection of the warehouse on May 16, 2012. However, this argument is a nonstarter because it is undisputed that Schwab did complain. She filed her own discrimination complaint in August 2012.  Plaintiff acknowledges this but says that Schwab's discrimination complaint is irrelevant because "Schwab's involvement with Brown regarding his disciplinary conduct occurred on May 16 and August 2, prior to her EEO complaint."  Plt.'s Br., dkt. #30, at 30.  It is difficult to follow the logic of this argument.  Different treatment of similarly situated employees may be probative because it suggests that the reason for the difference is the plaintiff's protected conduct.  However, if both employees engaged in the same protected conduct (in this case, filing complaint with the EEOC), then any inference of retaliation that could be drawn from the different treatment is extinguished.  The fact that Schwab engaged in protected conduct after her involvement with plaintiff's discipline has no bearing on the reasons that Shealey disciplined plaintiff but not Schwab.

In any event, plaintiff was not disciplined simply for failing to sign in a guest who was in the warehouse on company business, so plaintiff cannot argue persuasively that Schwab's conduct was comparable to hers.  Cf. Harris v. Warrick County Sheriff's Dept., 666 F.3d 444, 449 (7th Cir. 2012)("In other cases in which a minority plaintiff had some shortcomings in common with a better-treated nonminority employee but was terminated for additional, distinct performance problems, we have found the comparator employee not

similarly situated.").  Plaintiff also notes that "Holden was never disciplined for failing to individually swipe his badge on September 5, 2012," Plt.'s Br., dkt. #30, at 27, but he does not develop an argument that he and Holden were similarly situated, so that argument is forfeited.

## C.  Pretext

### 1.  Delay in disciplining plaintiff

A third type of evidence supporting a retaliation claim is evidence that the decision maker did not honestly believe that the employee had engaged in misconduct.  Simple v. Walgreen Co., 511 F.3d 668, 671 (7th Cir. 2007).  For example, plaintiff says that he told Shealey that a guest would be visiting him on May 16 and Shealey did not have a problem with it.  In addition, plaintiff says that, later on May 16 (after Schwab complained), Shealey told plaintiff that it was "no big deal."  However, even if I assume that Shealey initially concluded that plaintiff should not be disciplined for the events on May 16, it is undisputed that Shealey recommended plaintiff for discipline on June 14, which was two weeks *before* plaintiff contacted the EEO counselor.  Thus, it cannot be inferred reasonably that Shealey changed his mind because of plaintiff's protected conduct.  For the same reason, I do not find persuasive plaintiff's argument that an unlawful motive may be inferred because Shealey did not initiate the disciplinary proceedings "as soon as possible," as required by department policy.  Plt.'s PFOF ¶ 219, dkt. #37 (department's disciplinary policy states, "The Department will investigate an incident or situation as soon as possible to determine

whether or not discipline is warranted.").

2.  Shealey's investigation

Plaintiff denies some of the other incidents that were the subject of his discipline, such as allowing Martinson to use his computer and leaving the warehouse doors unlocked. However, the relevant question is not whether plaintiff actually committed the disciplinary infractions, but whether Shealey honestly believed that he did.  Collins v. American Red Cross, 715 F.3d 994, 1000 (7th Cir. 2013) ("[P]laintiff must show that her employer is lying, not merely that her employer is wrong.").  With respect to all the incidents that plaintiff denies, Shealey relied on reports of other employees in concluding that plaintiff had engaged in the alleged misconduct, so plaintiff must adduce evidence that Shealey did not believe those reports but decided to discipline plaintiff anyway.  (Plaintiff does not argue that any of the other employees had an unlawful motive and tried to influence Shealey to discipline plaintiff, so I do not consider that issue.)

Plaintiff attempts to make this showing by arguing that Shealey conducted a lackluster investigation that violated department policy.  Plaintiff cites Bruso v. United Airlines, Inc., 239 F.3d 848, 860-61 (7th Cir. 2001), for the proposition that "a sham investigation can serve as evidence of unlawful retaliation," Plt.'s Br., dkt. #30, at 28, but the issue in Bruso was whether the plaintiff was entitled to punitive damages for harassment because the employer failed to comply with its own anti-discrimination policies.  The court

22

did not consider the extent to which a failure to investigate misconduct supported a retaliation claim.

In my own research, I uncovered <u>Smiley v. Columbia College Chicago</u>, 714 F.3d 998, 1003 (7th Cir. 2013), in which the court stated that "[a]n employer's investigation, or lack thereof, can inform the pretext inquiry."  However, plaintiff identifies few additional steps that Shealey should have taken in his investigations. Plaintiff says generally that Shealey should have interviewed more witnesses, but that is the same argument the court rejected in <u>Smiley</u>.  Particularly because Shealey received written statements from plaintiff and the other employees involved, any failure by Shealey to conduct interviews is not suspicious.

Further, it is not a fair characterization of the evidence to say that Shealey "simply took the word of other VA employees . . . over" plaintiff.  Plt.'s Br., dkt. #30, at 28.   To begin with, plaintiff admitted some of the charges.  With respect to the charges plaintiff denied, Shealey relied on information provided by a number of different witnesses, many of whom did not know about plaintiff's discrimination and one of whom (Washington) did not work at the center.   Plaintiff has not identified any reason Shealey should have been suspicious of the motives of the other employees.  With respect to the alleged repeated failures to secure the warehouse, plaintiff was the only employee who worked at the warehouse and he was responsible for keeping it secure, so it is not surprising that Shealey blamed plaintiff, particularly in the absence of any reason to believe that the other employees fabricated their reports.  (The one possible exception is Boutelle, the employee who reported the unlocked door on October 15, 2012, because Boutelle got plaintiff's job

after plaintiff was fired.  However, any bias Boutelle may have had was unrelated to plaintiff's protected conduct, so it is not probative of a retaliatory motive.)

Plaintiff suggests that Shealey's failure to interview witnesses violated department policy, but the policy he cites says only that "a reasonable effort will be made to reconcile conflicting statements by developing additional evidence."  Plt.'s PFOF ¶ 219, dkt. #37. The policy does not state that the investigator must interview witnesses in the event of a conflict and plaintiff does not identify any other "additional evidence" that was available to Shealey.  Even if I assume that Shealey could have done more, that would not be enough to sustain plaintiff's claim.  Perhaps if plaintiff had adduced evidence that Shealey investigated the allegations against plaintiff differently from the allegations against other employees, Shealey's failure to take additional steps would be probative.  However, a lackluster investigation is not in itself evidence of an unlawful motive.  Collins, 715 F.3d at 999 ("[The employer's] report [finding employee guilty of misconduct] was sloppy, and perhaps it was also mistaken or even unfair. But Title VII does not forbid sloppy, mistaken, or unfair terminations; it forbids discriminatory or retaliatory terminations.").

Alternatively, plaintiff seems to suggest that Shealey framed plaintiff for things he did not do.  For example, in his response to the charge that he left the warehouse unlocked on September 5, he wrote, "It seems very convenient and coincidental that the alleged violations [occurred] during a period of time it was known that I was to be absent," suggesting that Shealey went to the warehouse when he knew that plaintiff would be gone so that Shealey could make it look like plaintiff left the door unlocked.  However, plaintiff has nothing but

24

speculation to support his theory.  Even his statement that Shealey knew that plaintiff would be gone when Shealey went to the warehouse is unsupported.  Plaintiff includes a proposed finding of fact that he told Shealey he was going out to buy garbage cans, Plt.'s PFOF ¶ 175, dkt. #37, but the email actually stated that plaintiff had not been able to get the cans because he did not have the keys to the company van.

Along the same lines, plaintiff says that Shealey was "fishing for evidence" when he started monitoring plaintiff's internet usage.  Plt.'s Br., dkt. #30, at 25.  However, in light of Ernest Washington's allegation that Martinson had been using plaintiff's work computer, plaintiff does not deny that it was reasonable for Shealey to view the computer logs to try to determine whether Martinson had viewed sensitive information.  Although Shealey later extended the scope of the monitoring to cover a longer span of time, I cannot say that it would be unreasonable  for Shealey to investigate whether there may have been other days that the computer had been used inappropriately.

3. Severity of discipline

Plaintiff cites Miller v. Illinois Dept. of Transportation, 643 F.3d 190, 194 (7th Cir. 2011), for the proposition that a "disingenuous overreaction" may be evidence of retaliation. However, the facts in Miller bear no similarity to this case.  In Miller, the defendant terminated an employee for stating to a coworker that "[s]ometimes [he] would like to knock [the personnel manager's]  teeth out," even though the employee had no disciplinary history and an employee who had threatened to kill coworkers had not been disciplined.  Id.  In this

case, plaintiff does not deny that the charges against him, if true, are sufficiently serious to justify his dismissal.  In fact, plaintiff argues that leaving the warehouse unlocked or open repeatedly suggests such a high level of incompetence that "the only reasonable explanation" is that someone other than plaintiff must have done those things. Plt.'s Br., dkt. #30, at 26. However, as discussed above, plaintiff has adduced no evidence that he was set up or that Shealey did not honestly believe that plaintiff engaged in the alleged conduct, so his concession that the conduct demonstrates incompetence provides support for defendant's position rather than plaintiff's.

D.  Timing

Plaintiff argues that the decisions to discipline and then terminate him are suspicious because they both occurred within a few weeks of his protected conduct, but the court of appeals has stated many times that temporal proximity between protected conduct and an adverse decision is rarely enough to prove a retaliation claim without additional probative evidence. Muhammad v. Caterpillar, Inc., 767 F.3d 694, 700-01 (7th Cir. 2014) ("[W]e have repeatedly held that mere temporal proximity is rarely sufficient."). Further, the timing of defendant's actions must be viewed in context, Davis v. Time Warner Cable of Southeastern Wisconsin, L.P., 651 F.3d 664, 674 -75 (7th Cir. 2011), and the context of the defendant's disciplinary decisions is not suspicious for several reasons.

First, although plaintiff was not disciplined until after he complained to the EEO counselor, Shealey recommended plaintiff for discipline two weeks *before* that complaint, as

26

discussed above.  Second, plaintiff's initial complaint to the counselor arose out of his May 16 interaction with Schwab, the same interaction that provided one of the grounds for plaintiff's suspension.  Although an employer may not retaliate against an employee for complaining about discrimination, it is also true that an employee may not immunize himself from discipline simply by alleging that the discipline is discriminatory.  Hall v. Bodine Electric Co., 276 F.3d 345, 359 (7th Cir. 2002) ("[A]n employee's complaint of harassment does not immunize [him] from being subsequently disciplined or terminated for inappropriate workplace behavior.").  In any event, because plaintiff's complaint and the disciplinary charges arose out of some of the same incidents, it is not surprising that the complaint and the discipline occurred around the same time.

With respect to the disciplinary issues that arose after plaintiff's contact with the EEO counselor, defendant has provided legitimate reasons for those decisions and plaintiff has not adduced evidence that any of those reasons is pretextual.  Morgan v. SVT, LCC, 724 F.3d 990, 998 (7th Cir. 2013)   ("Where, as here, there are reasonable, non-suspicious explanations for the timing of [an employee's] termination . . . , we will not deny summary judgment solely on the strength of this one point.").  Particularly because many of the complaints about plaintiff's performance originated with individuals other than Shealey who were not even aware of plaintiff's protected conduct, I see nothing suspicious about Shealey's decision to discipline plaintiff in response to those complaints.

E.  Other Issues

27

Finally, on pages 24-26 of his brief, plaintiff lists a number of proposed facts that he says provide support for his retaliation claim, but he does not accompany the list with any argument.  To the extent that any items on the list have not been addressed in this opinion, it is because plaintiff has forfeited the arguments by failing to develop them.


ORDER

IT IS ORDERED that defendant Robert McDonald's motion for summary judgment, dkt. #13, is GRANTED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 5th day of December, 2014.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge